FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 APR 30 AM 9: 10

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| LARRY MAYNE, ET AL., | ) |
| Plaintiff, | ) |
| v. | ) CIVIL ACTION NO. 96-PWG-3221-S |
| SAMFORD UNIVERSITY, | ) |
| Defendant. | ) |

ENTERED

APR 3 0 1999

MEMORANDUM OPINION

Plaintiffs Larry Mayne, Russell Dulaney and Donnie Davis filed this action against defendant Samford University asserting a Fair Labor Standards Act (FLSA) claim and a promissory fraud claim. This matter is before the court on defendant's motion for summary judgment. The parties have consented to the magistrate judge's jurisdiction pursuant to 28 U.S.C. § 636(c)(1).

Summary judgment is appropriate only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Rule 56, *Federal Rules of Civil Procedure*. In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries



the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [Citation omitted]. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

898 F.2d at 1532.

The following facts are undisputed. Plaintiffs Dulaney, Davis and Mayne were employed by Samford University as maintenance workers. Plaintiffs volunteered to accept on-call positions which required that they live in campus housing provided by the University.[1] Plaintiffs' families were permitted to live in the campus housing. Each plaintiff was on call approximately one week out of every month. Plaintiffs paid nothing for the campus housing, they received free water,

---

[1] Dulaney was hired by Samford in December 1989. (Defendant's Exhibits 1 at 19). He lived on campus from February 1995 until August 1996, approximately eighteen months. (Defendant's Exhibit 1 at 29-31).

Davis began working at Samford on August 8, 1988. (Defendant's Exhibit 2 at 26). Davis lived on campus from November 1988 until February 1996, just over seven years. (Defendant's Exhibit 2 at 14). Davis did not quit working for Samford until September 1996. (Defendant's Exhibit 2 at 60).

Mayne began working at Samford in 1991. (Defendant's Exhibit 3 at 51). While living off campus, Mayne was not on-call. (Defendant's Exhibit 3 at 64). He lived on campus from May 1992 until September or October 1996, just over four years. (Defendant's Exhibit 3 at 59,65).

2

utilities and were accredited with four hours compensatory time. (Defendant's Exhibits 3 at 22-23,95,107-08; 2 at 57-58,67,76,93,96; and 1 at 36,43-44,101). Plaintiffs' decisions to volunteer for on-call work was motivated at least in part by the fact that they would be provided a house rent free. (Defendant's Exhibits 1 at 36,43-44; 2 at 56-58; and 3 at 67). On-call employees were required to live in on-campus housing for the convenience of the University to ensure that maintenance calls were handled promptly. (Plaintiffs' Exhibit 2). The University did not create nor maintain documentation establishing the value of the housing provided, nor did it create any documentation memorializing the agreement with employees to make wage deductions. (Plaintiffs' Exhibit 3 at response #22).

During an on-call week, plaintiffs worked their normal eight hour shift for which they were paid in the usual manner and were then on-call for the remainder of the day and night. (Defendant's Exhibit 2 at 61). Plaintiffs were required to respond to any after hours calls within 10 to 15 minutes. (Defendant's Exhibits 1 at 47; 2 at 97; 3 at 100).

While on call plaintiffs recorded in a logbook the time of service calls, the location of the problems and the steps taken to remedy the problems. (Defendant's Exhibits 3 at 91; 2 at 77-78; and 1 at 94-95). Plaintiffs did not clock-in for on-call service calls and did not receive pay in the form of overtime or straight time for time spent on-call. (Defendant's Exhibits 1 at 96-98; and 3 at 90,93,95). Davis testified that on average, he received ten to twelve calls during an on-call week but that he had received up to twenty or thirty calls a week a few times. (Defendant's Exhibit 2 at 77).

Plaintiffs' on-call duties included the routine regular weekend tasks of changing the letters on the marquee sign, putting up signs on the grass and setting up and taking down microphones for weddings. (Defendant's Exhibits 1 at 123-24; 2 at 72-75; and 3 at 108-11). These regular duties would take approximately seven hours a week. (Defendant's Exhibit 2 at 72-75).

Plaintiffs did not clock-in for this time and did not receive additional pay for performing these duties. (Defendant's Exhibit 2 at 72-75). During their on-call week, plaintiffs were required to clock-in for four hours of work on Saturday morning to answer phones and they were paid for this time. (Defendant's Exhibit 1 at 99-101;2 at 83-84,112; and 3 at 142-43).

Plaintiffs testified that during idle on-call time they could do pretty much what they wanted, including activities such as watching television, sleeping, eating or otherwise spending time with their family in their own or other on-call staff member's homes, exercising, going to Samford football games, playing basketball, handling personal business, and even leaving campus as long as they could respond to a call received on their cell phone or pager within ten to fifteen minutes. (Defendant's Exhibits 3 at 99-101,125,257,258-59;2 at 97-98,100-01,105,106; and 1 at 46-47). Samford did not monitor the on-call staff to ensure that they stayed on-campus. (Defendant's Exhibit 1 at 47-48).[2] During the weeks that plaintiffs were not-on call, they could come and go as they pleased. (Defendant's Exhibit 1 at 44-45).

I.  <u>Whether plaintiffs' FLSA claims are barred by 29 C.F.R. § 785.23.</u>

The FLSA requires that employees be paid overtime for hours worked in excess of forty hours a week. 29 U.S.C. § 207(a)(1). Agreements to pay and to receive less pay than statutorily provided are against public policy and unenforceable. *Barrentine v. Arkansas-Best Freight System*, 450 U.S. 728 (1981); *Rudolph v. Metropolitan Airports Com'n*, 103 F.3d 677, 680 (8th Cir. 1996).

---

[2] Plaintiffs all testified that they could leave campus while on-call but that they had to be able to respond to a call within 10 to 15 minutes. (Defendant's Exhibits 1 at 46-47; 2 at 98; and 3 at 100). Plaintiffs then submitted the affidavit of Pat Noble who stated that plaintiffs were forbidden from leaving campus while on call. (Plaintiffs' Exhibit 2). To the extent that Nobels' affidavit contradicts plaintiffs' deposition testimonies, that portion of the Nobles' affidavit is not considered.

Defendant relies on 28 C.F.R. § 785.23 which is an exception to the rule that agreements to pay and receive less pay are unenforceable. Section 785.23 provides:

> An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises. Ordinarily, he may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own. It is, of course, difficult to determine the exact hours worked under these circumstances and <u>any reasonable agreement</u> of the parties which takes into consideration all of the pertinent facts will be accepted. This rule would apply, for example, to the pumper of a strip well who resides on the premises of his employer and also to a telephone operator who has the switchboard in her home. (Emphasis added).

Defendant relies on two Eighth Circuit cases that followed § 785.23 in finding that plaintiffs' FLSA claims were barred. In *Rudolph v. Metropolitan Airports Com'n, supra*, the plaintiffs sought back wages for time they spent providing home care of canine unit dogs. In *Rudolph*, the commission and the officers formed an interim agreement that the officers would be compensated for one-half hour of dog care on their on-duty days and one hour of dog care on their off-duty days. The agreement directed that the officers were not to provide additional care unless they had prior approval from a supervisor.

Subsequently, the commission reduced the off-duty care time to one-half hour on all days. Ultimately, after mediation the commission and plaintiffs agreed that plaintiff would accept pay

5

for one-half hour of work on all days and a take home vehicle and no specialist pay. The court held that § 785.23 applied to the facts in *Rudolph* reasoning:

> The reason for there being such a regulation in the first place also covers this case. The employer cannot easily determine how long the officers work at home caring for the dogs. Dog care–feeding, grooming, cleaning cages or pens, and exercising–may take more time on one day than on others. It may be spread out, sporadic in nature. An officer might feed a dog when they first get home, give the dog water later, and perform other care still later. The indeterminate nature of these tasks, we think, makes them exactly the sort of work as to which it makes sense for the parties to come to an agreement, to eliminate complicated, repetitious, and hard-to-resolve disputes about exactly how much time it took to take care of the dogs each day. So long as there was an agreement in fact, and the agreement was reasonable, we think § 785.23 applies to this case. It was proper for the District Court to put to the jury the question whether the parties had made a reasonable agreement.

103 F.3d at 681.

The court further noted that:

> Any time beyond the half-hour plaintiffs spent with their canine charges we presume stemmed from their personal devotion to the dogs, and was, therefore, not "predominantly for the benefit of the employer," *Henson v. Pulaski County Sheriff Dep't*, 6 F.3d 531, 534-35 (8th Cir. 1993), as it must be in order to constitute "work" within the statute's meaning.

103 F.3d at 684. (Citations omitted).

The court concluded that a reasonable agreement existed as to off duty duties and that plaintiffs were therefore not entitled to any back pay.

In *Gaby v. Omaha Home for Boys*, 140 F.3d 1184 (8th Cir. 1998), the plaintiffs were "house parents" employed by the Omaha Home for Boys. At issue was an employment agreement which provided that house parents would work a six day, sixty hour work week and would receive forty hours of regular pay and twenty hours of overtime pay. After hearing evidence the court concluded that the parties made a reasonable agreement as to the amount of time normally required to perform the work of house parents.

In both *Rudolph* and *Gaby* the work was performed where the plaintiffs also lived. Further, there were agreements providing for some overtime compensation. In *Rudolph* the court explained that the reason for § 785.23 was because of the difficulty in determining how long tasks of an indeterminate nature should take each day when performed by employees working at home. In other words, the purpose of § 785.23 was to allow the parties to agree on the amount of overtime for which the employee is to be compensated while living on the employer's premises or working out of his home when the amount of time worked would be otherwise difficult to calculate. Here, the tasks to be performed by plaintiffs were not performed in plaintiffs' homes which were located on the employer's premises. Rather, plaintiffs would respond to calls at other locations on campus, handle the task and return home. The length of time required to perform on-call tasks should not have been difficult to determine because all plaintiffs submitted on-call information sheets and could have kept up with the length of time required to complete each call except for the fact that they were specifically told not to clock-in for those on-call calls. The court concludes that plaintiffs' FLSA claims are not barred by § 785.23.

Defendant argues nevertheless that plaintiffs and defendant, through their conduct, reached a reasonable agreement as to the manner in which plaintiffs would be compensated for on-call

7

work. Defendant argues plaintiffs were provided free housing, free water utilities, four hours of compensatory time as compensation for being on-call, for time spent responding to calls and for time spent performing the routine weekly on-call jobs.

There is no evidence of an agreement that the housing, utilities and compensatory time were intended as compensation. There is no documentation indicating either the value of the housing at the time of plaintiffs' employment or that plaintiffs' wages would be reduced by the value of the housing. Further, the testimony tends to indicate that plaintiffs were provided with housing and utilities in an effort to recruit them to accept on-premises, on-call duty. There is evidence that defendant sought on-premises, on-call employees for the convenience of defendant as it would ensure prompt service on after hours maintenance calls. There has been no evidence presented that plaintiffs received a pay increase for accepting on-call duty. A jury could reasonably infer that, to the extent that there was any agreement, the housing and utilities were to compensate not for overtime but for the inconvenience of being on-call. Likewise, there was evidence that the four hours comp time was intended to give plaintiffs an opportunity to handle personal matters that had to go unattended while plaintiffs were on-call. (Defendant's Exhibit 3 at 95-96). Defendant's motion for summary judgment is due to be denied with respect to plaintiffs' FLSA claims to the extent that plaintiffs seek compensation for time spent working while on-call.

II  <u>Whether plaintiffs are entitled to compensation under the FLSA for idle on-call time.</u>

Plaintiffs argue that they are entitled to compensation for not only on-call time spent responding to calls but also for idle on-call time. Defendant, however, argues that plaintiffs' idle on-call time is not compensable because the idle time was spent primarily for the benefit of the employee. Whether idle on-call time is compensable under the FSLA is a matter of law. *Birdwell v. City of*

*Gadsden*, 970 F.2d 802, 807 (11th Cir. 1992). In *Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944), the court held that if the employee is waiting to be engaged the idle on call time is not compensable; however, if the employee is engaged to wait the idle on call time is compensable. In determining whether an employee is waiting to be engaged or is engaged to wait, the court looks to "the degree to which the employee may use the time for personal activities." *Birdwell*, 970 F.2d at 807-08. *See also Bright v. Houston Northwest Medical Center Survivor, Inc.*, 934 f.2d 671, 676-77 (5th Cir. 1991), *cert. denied*, 502 U.S. 1036 (1992); *Halferty v. Pulse Drug Company, Inc.*, 864 F.2d 1185, 1189 (5th Cir. 1989). When the employee's idle on-call time is spent primarily for the benefit of the employer the employee is entitled to compensation. *Birdwell*, 970 F.2d at 807; *Halferty*, 864 F.2d at 1190. In order to receive compensation for idle on-call time, an employee's on-call time must be severely restricted. *Birdwell*, 970 F.2d at 810.

> When deciding whether on-call time is covered by the FLSA, the court should examine
>
> > the agreement between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances.

*Birdwell*, 970 F.2d at 808, *quoting Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944).

Although there was no explicit agreement, there may have been an implicit agreement that the on-campus living arrangement for on-call employees was for the defendant's benefit and that the housing, utilities and comp time were intended to compensate the on-call employees for the inconvenience of being on-call. The amount of time spent working while on-call could vary dramatically from one on-call week to the next. At a minimum, an on-call employee would be

9

required to spend approximately seven hours performing routine tasks even before receiving any calls. The amount of work could vary greatly from week to week (and even from day to day). While waiting on the calls, plaintiffs could do whatever they wished to do at home. After considering all of these facts, the court concludes that plaintiffs are not entitled to compensation for idle time spent on call as the housing, utilities and comp time were the "compensation" for this idle time.

Relying on the Ninth Circuit case of *Owens v. Local No. 169*, 971 F.2d 347 (9th Cir. 1992), plaintiffs argue that this court should consider the following factors in deciding whether the idle on-call time was spent primarily for the benefit of the employer:

(1) <u>On premises living requirement.</u>

All of the plaintiffs were employed at Samford prior to being offered and accepting on-call duty. Plaintiffs were motivated to accept the on-call positions by the fact that they would be provided a house rent free. As previously concluded, a jury could reasonably infer from the evidence that Samford provided free housing and utilities to compensate plaintiffs for the inconvenience of being on-call. Each plaintiff was on-call only one week out of each month. While not on call, plaintiffs could go wherever they chose after hours. While on-call, plaintiffs were not only on campus but, more importantly, "at home," where they could attend to a number of personal matters.

(2) <u>Geographical restrictions.</u>

Although plaintiffs' position in the statement in opposition to defendant's motion for summary judgment is that they were forbidden from leaving campus while on call, plaintiffs testified in deposition that they could leave campus while on-call but that there were limits as to how far they could go due to the 10 to 15 minute response requirement. (Defendant's Exhibit 1 at 46-47; 2 at 98; and 3 at 100). While plaintiffs may not have been able to run some personal errands during their on-

10

call week, they were given four hours comp time the week following an on-call week that was intended to give them an opportunity to take care of personal matters that could not be attended to during the on-call week. (Defendant's Exhibit 3 at 95-96).

  (3) <u>Frequency of calls</u>.

Plaintiffs argue that due to the frequency of the calls, plaintiffs were unable to relax and enjoy time away from work and often could not get a full night of rest throughout the entire week on-call. The court has reviewed the on-call information sheets which were exhibits to the deposition transcripts of plaintiffs. A review of the sheets reveals that there were few occasions when plaintiffs were disturbed between 10:00 p.m. and 7:00 a.m. Further, there were many days during the on-call period when there were fewer than three calls. On rare occasions, such as December 10, 1995 and June 16, 1996, the on-call plaintiff would have to respond to as many as ten calls a day.[3]

There were two on-call information sheets on plaintiff Davis. From November 28, 1995 through December 4, 1995 there were a total of twenty calls, one of which occurred at 11:05 p.m. on November 29, 1995 and one of which occurred at 12:15 a.m. on December 3, 1995. All other calls occurred prior to 9:00 p.m. From January 8, 1996 until January 14, 1996 there where eleven calls, three of which occurred at 10:30 p.m. on January 8, 1996 and one of which occurred at 11:30 p.m. on January 11, 1996. All other calls occurred prior to 7:30 p.m.

There were seven on-call information sheets submitted on Dulaney. From August 5, 1996 through August 11, 1996, Dulaney received twelve calls, one of which occurred at 5:15 a.m. on August 6, 1996 and one of which occurred at 1:00 a.m. on August 7, 1996. From November 10,

---

[3] The court notes that the initials behind the December 10, 1995 entries are B.E. which are not the initials of any of the plaintiffs in this action.

11

1995 through November 19, 1995 Dulaney received twenty calls, one which occurred at 12:00 a.m. on November 17, 1995 one which occurred at 1:20 a.m. on November 18, 1995.

From December 10, 1995 through December 16, 1995 Dulaney received twenty calls, one which occurred at 10:45 p.m. on December 10, 1995. From February 26, 1996 through March 3, 1996 Dulaney received thirteen calls. From April 1, 1996 through April 3, 1996 Dulaney received sixteen calls, three which occurred at 9:30 and 9:45 p.m. on April 1, 1996, two which occurred at 6:45 a.m. on April 2, 1996 and three which occurred at 10:00 p.m., 10:30 p.m. and 10:50 p.m. on April 3, 1996. From May 3, 1996 through May 14, 1996 Dulaney received thirty-four calls, one which occurred at 9:30 p.m. on May 7, 1996, one which occurred at 9:00 p.m. on May 9, 1996, one which occurred at 11:45 p.m. on May 11, 1996 and one which occurred at 2:00 a.m. on May 11, 1996. From June 10, 1996 through June 16, 1996 Dulaney received twenty calls, one which occurred at 10:00 p.m. on June 13, 1996, one which occurred at 7:00 a.m. on June 16, 1996.

Six on-call information sheets were submitted on plaintiff Mayne. From February 12, 1996 through February 18, 1996 Mayne received twelve calls, one which occurred at 1:00 a.m. on February1 4, 1996. From November 22, 1995 through November 26, 1995, Mayne received three calls. From January 1, 1996 through January 8, 1996 Mayne received eleven calls, one occurring at 5:00 a.m. on January 8, 1996. From April 22, 1996 through April 28, 1996 Mayne received twenty-two calls, one which occurred at 10:00 p.m. on April 22, 1996, one which occurred at 10:30 p.m. on April 25, 1996, one which occurred at 11:30 p.m. on April 26, 1996, one which occurred at 10:00 p.m. on April 27, 1996 and one which occurred at 10:00 p.m. on April 28, 1996. From May 27, 1996 through June 2, 1996 Mayne received eight calls, one which occurred at 11:30 p.m. on May 27, 1996, one which occurred at 1:00 a.m. on May 27, 1996, one which occurred at 1:00 a.m. on May 28, 1996

and one which occurred at 7:00 a.m. on May 30, 1996. From July 1, 1996 through July 7, 1996, Mayne received four calls, one which occurred at 6:00 a.m. on July 4, 1996.

Plaintiffs rely on 29 C.F.R. § 785.22 for the proposition that a plaintiff who cannot get a reasonable nights' sleep should be paid for all time on-call including sleeping time. 29 C.F.R. 785.22(b) interprets a reasonable nights' sleep as at least five hours' sleep. Although plaintiffs received fairly frequent calls, seldom was a plaintiff unable to get at least five hours of uninterrupted sleep. Although plaintiff Davis testified that he could not sleep well because the phone would ring ninety percent of the time about the time he would go to sleep (Defendant's Exhibit 2 at100), the on-call information sheets before the court do not support this estimate of sleep interruptions. Further, neither plaintiff Dulaney nor plaintiff Mayne complained of any trouble sleeping

   (4) <u>Response time</u>.

Plaintiffs were required to respond to calls within 10 to 15 minutes. While plaintiffs were limited in their ability to travel far from campus based on this response time, plaintiffs were on-call for only one week out of the month and during this on-call time plaintiffs were able to respond to calls from their homes.

   (5) <u>Trading on-call time</u>.

While plaintiffs did not find it desirable to trade on-call weeks, defendant did not place any limitation on trading on-call time.

   (6) <u>Use of a pager/cellular phone.</u>

While the pager or call-phone may have been intended for the convenience of defendant by allowing plaintiffs to receive a second call while still responding to the first call, the

phone also gave plaintiffs additional freedom to leave campus while on-call. (Defendant's Exhibits 1 at 46-47; 2 at 98).

      (7)    <u>Actual engagement in personal activities</u>.

Plaintiffs complain that personal activities at home were constantly interrupted, they could not do any personal activity away from campus, could not attend the movies and could not attend off-campus athletic events. While a plaintiff may have been restricted in the ability to engage in off-campus activities during an on-call week, personal activities at home which happened to be on-campus were not restricted. The on-call information sheets reflect that the number of interruptions varied dramatically from week to week and from day to day.

Having considered all of these factors, the court concludes that the idle on-call time was spent primarily for the benefit of the employee. Defendant is entitled to summary judgment with respect to the FLSA claim for compensation for idle on-call time.

II    <u>Whether plaintiffs' overtime promissory fraud claim fails as a matter of law.</u>

Plaintiff Dulaney and Mayne have conceded that they are not able to present sufficient evidence to maintain promissory fraud claims. (Plaintiffs' statement in opposition to defendants' motion for summary judgment, unnumbered p.21).

Plaintiff Davis continues to maintain his claim stating:

> Donnie Davis testified in deposition about a conversation that he had with Rudy Hilton, Samford's director of the physical plant. Rudy Hilton represented to Donnie Davis that he would be paid for his overtime work. Donnie Davis relied on this misrepresentation and continued his employment with

14

>the university. As a result, he was damaged in that he performed the on-call work without compensation.

(Plaintiff's Statement in Opposition to Defendant's Motion for Summary Judgment, unnumbered p.21).

A claim of promissory fraud requires proof of six elements: (1) a false representation, (2) of a material existing fact, (3) that is justifiably relied upon by the plaintiff, (4) that causes damage to the plaintiff as a proximate result of the reliance, (5) proof that, at the time of the misrepresentation, the defendant had no intention to perform the act as promised, and (6) proof that the defendant had an intent to deceive. *Triple J. Cattle v. Chambers*, 621 So.2d 1221, 1224 (Ala. 1993); *Vance v. Huff*, 568 So.2d 745, 750 (Ala. 1990).

Plaintiff Davis's characterization of his deposition testimony is misleading. Plaintiff Davis actually testified:

Q: Why did you move out of the house [at Samford]?

. . . .

A: And to get off call, because I was getting ripped off on call.

Q: What do you mean you were getting ripped off on call?

A: Well, I mean they wasn't – they told us that they was going to pay us for being on call.

Q: Who is they?

A: Rudy Hilton, director of the physical plant, or he was going to check into it.

Q: When was that?

A: That was probably in '95, somewhere along there.

Q: What was the conversation you had with Rudy about that?

15

A: He called a meeting with – with the on-call people and said that – that he was going to check into getting us time for being on call, but when I moved in, they said it would be emergency calls only, and it was every kind of call you can imagine would come int.

Q: Well, you stated that when you had that meeting with Rudy that he said that he was going to try to get you time for being on call. What did you understand that to mean?

A: For the time we was on call.

Q: How much time are you on call?

A: You're on call twenty-four hours a day on the week that you're on call.

Q: How many weeks a month are you on call?

A: Well, it's according to how many was on call. I mean, we had as many as six and as small amount as three.

Q: Who all was at that meeting that Rudy called?

A: I don't know that anybody was in the meeting. I think it was when I was sitting up there at a desk one day, and he just come in and started talking to me, one Saturday.

Q: Do you remember when that was?

A: No, I don't.

Q: Do you remember what year it was?

A: It was probably '95.

(Defendant's Exhibit 2 at 60-62).

Q: You mentioned earlier about a meeting or sometime when Rudy Hilton told you he would look into getting you paid for comp time, and I think, if it remember correctly, you said that was sometime in 1995?

A: Yeah.

16

> Q: Do you remember what, if anything, Rudy did to, quote, look into that?
>
> A: I don't know of anything that he did.

(Defendant's Exhibit 2 at.109).

> Q: And when you had that discussion with Rudy where he told you he would check on getting paid for the on-call time, was he talking about the time that you were responding for calls or the whole time when you were waiting and responding to calls?
>
> A: He never said.
>
> Q: What was your understanding?
>
> A: I understood that it would be the whole time that I was waiting for a call.
>
> Q: Did he ever get back to you about that?
>
> A: No, he didn't.
>
> Q: Did you ever check on it with him.
>
> A: You couldn't hardly ever get in to see him, I mean – but, no, I didn't ever talk to him about it.
>
> Q: Did he ever get back to any other maintenance employee?
>
> A: Not that I'm aware of.
>
> Q: Was that information something that you asked him to do or he volunteered to do?
>
> A: No, he volunteered that.

(Defendant's Exhibit 2 at 113-14).

Hilton did not promise Davis compensation for on-call time but rather only volunteered to check into getting on-call employees comp time. It is unnecessary to address each of the elements of promissory fraud as Davis could not have justifiably relied upon Hilton's statement that he would "check into it"

17

as a promise that he would be paid overtime. Defendant's motion for summary judgment is thus due to be granted with respect to the promissory fraud claim.

Based on the foregoing, defendant is entitled to summary judgment with respect to plaintiffs' FLSA claim of entitlement to compensation for idle on-call time and with respect to the promissory fraud claim. Defendant is not entitled to summary judgment with respect to plaintiffs' FLSA claim of entitlement to compensation for time actually worked while on call. A separate order consistent with this memorandum opinion will be entered simultaneously herewith.

DONE this the 27 day of April, 1999.

PAUL W. GREENE
UNITED STATES MAGISTRATE JUDGE